

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00026-CR

TRENT BARROW, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 23M1507-CCL

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

A Bowie County jury convicted Trent Barrow of family violence assault, a class A misdemeanor. *See* TEX. PENAL CODE ANN. § 22.01(a)(1) (Supp.). The jury assessed a sentence of 365 days' confinement and a $2,000.00 fine but recommended community supervision. As a result, the trial court suspended Barrow's sentence and placed him on community supervision for twenty-four months.

In his sole point of error on appeal, Barrow argues that the evidence is legally insufficient to support the jury's verdict. Because we find the evidence legally sufficient, we overrule Barrow's sole point of error. Even so, we modify the trial court's judgment to reflect that there was no plea agreement in this case. As modified, we affirm the trial court's judgment.

## I. Legally Sufficient Evidence Supported the Jury's Verdict

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and

to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Here, the State's information alleged that Barrow "intentionally, knowingly, or recklessly cause[d] bodily injury to Lakeyvia Hunt, a . . . person with whom the defendant had or has had a dating relationship . . . by grabbing Hunt's throat and throwing her down to the ground."

### B. The Evidence at Trial

At trial, it was undisputed that Barrow and Hunt were in a dating relationship and had fought, but Barrow alleged that the fight was only verbal. Yet, eighteen-year-old Hunt testified that thirty-six-year-old Barrow became jealous of her, accused her of "talking to other guys," threatened to kill her, and prevented her from leaving his trailer home. Hunt said that she became scared and that Barrow snatched her phone from her hand. According to Hunt, Barrow "bum rushe[d] [her] and start[ed] choking [her]," while saying, "I'll kill you, I want you to die."

3

Hunt testified that, although Barrow had two hands around her neck, she was still "able to breathe." Hunt asked Barrow to let her go, and he complied.

Hunt testified that Barrow walked out of the bedroom where the initial incident occurred and that she used that time to try to leave. Hunt said that Barrow caught her, dragged her by her hair back into the bedroom, and threw her "up against his dresser" "so hard[] [that] the mirror fell off the wall and hit [her] in the back of [her] head," which hurt. Hunt testified that Barrow began choking her again. According to Hunt, Barrow stopped the choking and left the room after telling her he was going to stab her. That time, Hunt ran out of the room, exited the trailer, and called her mother.

Hunt testified that she was still on the phone with her mother, while standing outside the trailer, when Barrow came "up behind [her]," "tackle[d] [her] on the ground," and began "actually choking [her]" and "squeezing" to the point that she "could barely breathe." Hunt said she kept asking Barrow to let her go and that he finally did so after throwing her phone "across the road," causing it to "black[] out." During that time, Hunt ran to a next-door neighbor's house to get help. Hunt said that the incident caused her pain and bodily injury.

Hunt's mother, Danielle McNeely, testified that she received Hunt's phone call during the incident. According to McNeely, Hunt sounded as if "something was wrong," and "[Hunt] started screaming, and she started just kind of saying, stop, please leave me alone, don't, just let me go." McNeely testified that "[i]t sounded like [Hunt] was being choked or she could barely breathe." According to McNeely, Hunt had sustained bruises from the altercation.

Barrow's neighbor, Kenneth Dolberry, Sr., testified that, during the incident, he heard a "high-pitched" scream followed by a knock at his door. According to Dolberry, Hunt appeared at his door "hysterical and frantic[,] . . . like real scared," and told Dolberry that Barrow tried to choke her. Dolberry tried to console Hunt while his wife called 9-1-1. Dolberry sent Hunt to the home of another neighbor, Alissa Sines.

Sines testified that Hunt banged on her door and appeared to be "very scared" when Sines answered. Because Hunt was "frantic, like she was running away," Sines knew Hunt was in trouble and allowed Hunt to borrow her phone to call her mother back. According to Sines, Hunt explained "that she was getting beat up" and used a hand motion to indicate that "she was being choked." Sines testified that she tried to console Hunt until the police arrived.

James Ward and Tanner Tolliver, officers with the Texarkana, Texas, Police Department, testified that they responded to Barrow's home. According to Tolliver, the Department received a call from "two callers [stating] that a woman was running through the trailer park . . . screaming that she had been attacked." Barrow told Ward that he had an argument with Hunt, who had left. According to Ward, Barrow's responses to questions "either didn't make sense or [were] answers that didn't line up with the questions [he] had." At that point, Ward left Barrow's home to look for Hunt. Ward testified that, when he found Hunt, she had "a red mark along her jaw line, and [he] believe[d] she had some marks around her neck and throat" and said that "her arm was hurting." According to Ward and Tolliver, Hunt said that Barrow had thrown her to the ground and choked her. Hunt also told Tolliver that Barrow had threatened to kill her. Ward photographed Hunt's injuries to her face, neck, and hands. The jury saw photos of Hunt's

5

injuries, along with Ward's and Tolliver's body-camera footage, in which Barrow admitted he had "f'd up."

Barrow testified in his defense and said he never laid a hand on Hunt. According to Barrow, Hunt was on the phone with someone early in the morning and would not tell him who it was. Barrow told Hunt to call her mother to pick her up but denied having an argument. Then, Barrow said that he threatened to call the police when Hunt would not say if she had called her mother. Instead, he said that Hunt just screamed and ran off. When asked why he would call the police if nothing happened, Barrow said it was because he did not know who Hunt was talking to on the phone, and he needed to protect his son, who was present in the home during the incident. During cross-examination, Barrow admitted that he was upset because Hunt was talking to another man.

Barrow's son said he was asleep during the incident. While he woke up to Barrow's "yelling," he assumed that Barrow was yelling at a video game and went back to sleep.

In rebuttal, Hunt testified that Barrow's story was fabricated.

After hearing the evidence, the jury found Barrow guilty.

### C.      Sufficient Evidence Supports the Finding of Guilt

Barrow argues that the evidence is insufficient to show that he committed the offense because there was conflicting evidence. However, when there is conflicting evidence, we defer to the jury's resolution so long as it is supported by the evidence. *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Here, testimony from Hunt and McNeely supported the jury's finding that Barrow assaulted Hunt with

6

the requisite intent. Further, the jury heard from two uninterested neighbors who said that Hunt appeared at their doors while hysterical stating that she had been attacked and needed to borrow a phone. Testimony of Hunt's injuries from the neighbors, Ward, and Tolliver and pictures of the injuries, along with body-camera footage, supported Hunt's testimony that she was choked.

We find that the jury was free to believe Hunt's account and to reject Barrow's story of what occurred on the day of the incident. As a result, we find that the evidence was sufficient for a rational jury to find, beyond a reasonable doubt, that Barrow intentionally, knowingly, or recklessly caused bodily injury to Hunt. Consequently, we overrule Barrow's first point of error.

## II.     We Modify the Judgment to Reflect the Absence of a Plea Bargain

The record in this case shows that there was no plea bargain. Even so, the trial court's judgment recites several terms of a plea bargain.[1] Because there was no plea bargain, we modify the trial court's judgment by deleting the heading "Terms of Plea Bargain" and replacing it with the words "Terms of Community Supervision."[2]

---

[1]Under a heading labeled "Terms of Plea Bargain," the judgment recites the following:

> 365 DAYS COUNTY JAIL; SUSPENDED AND PROBATED 24 MONTHS; $ 2000 FINE PLUS $ 270 COURT COSTS; $20 REIMBURSEMENT FEE; $15 CRIME STOPPERS FEE; $100 FAMILY VIOLENCE FINE; 100 HOURS OF COMMUNITY SERVICE; NO VICTIM CONTACT; ANGER MANAGEMENT/BIPP DOMESTIC VIOLENCE CLASSES & ANY OTHER CONDITIONS AS IMPOSED BY BOWIE COUNTY COMMUNITY SUPERVISION DEPARTMENT.

(Emphasis removed).

[2]"This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record." *Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc)). "The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Id.* (quoting *Asberry*, 813 S.W.2d at 529–30).

7

### III.    Conclusion

As modified, we affirm the trial court's judgment.


                                        Scott E. Stevens
                                        Chief Justice

Date Submitted:    September 15, 2025
Date Decided:      November 10, 2025

Do Not Publish